[No. 23469.   Department Two.   March 9, 1932.]

ALBERT BRANT *et al., Respondents,* v. SWEET CLINIC *et al., Appellants.*[1]

*Roberts, Skeel & Holman* and *Frank Hunter,* for appellants.

*Jo. D. Cook* and *J. H. Jahnke,* for respondents.

MILLARD, J.—This action was instituted by Albert Brant and Lorraine Brant, a marital community, to recover against a practicing physician and surgeon and a medical clinic corporation for alleged malpractice in removing a growth or cyst from the throat of plaintiff wife.   Plaintiffs alleged that the surgeon

[1]Reported in 8 P. (2d) 972.

". . . wholly failed to follow the established practice and to conform to the proper standards as practiced by his school of surgery in similar localities in performing said operation, and the said defendants, while associated together under their employment by the plaintiffs, and in disregard of their duties in the premises in attempting to remove said growth or branchial cyst, carelessly, negligently and unskillfully cut and severed the facial nerve on the left side of the face of the plaintiff, Lorraine Brant; that it was wholly unnecessary, improper and contrary to the established medical and surgical practice in the vicinity where said surgical operation was performed, to sever said nerve in order to successfully remove said growth or branchial cyst, and because of said severance she has completely lost the use of said nerve on the left side of her face . . .; that the distorted condition of her face and mouth caused by said unskillful operation is a permanent condition. . . ."

The cause was tried to a jury, which returned a verdict against the defendants. From the judgment entered upon the verdict, motions for judgment notwithstanding the verdict and for a new trial having been overruled, the defendants appealed.

Appellants contend that there is no evidence that the facial nerve of the respondent wife "was cut and severed, and if it were cut and severed," there is no proof of negligence, as other causes existed for the paralysis. It is argued that appellant surgeon was not operating in that portion of the tract in which the facial nerve is located.

The mere fact that a bad result may follow an operation is not of itself evidence of negligence. *Brear v. Sweet,* 155 Wash. 474, 284 Pac. 803.

The rule in malpractice actions is that

". . . a surgeon is not liable merely because of a bad result. *Peterson v. Wells,* 41 Wash. 693, 84 Pac. 608. And that he is not responsive in damages in a malpractice suit, if the treatment which he employs is

that which is recognized and approved by those reasonably skilled in his profession, practicing in the same neighborhood and in the same line of practice, and if he administers that treatment with a degree of skill and diligence as such practitioners ordinarily exercise in like cases. [Citing cases.].

"We also recognize that it is not a question of fact for the jury, but the court will determine that there is nothing upon which the jury may pass where reputable physicians and surgeons of equal skill and learning disagree in their opinion as to what the proper treatment should have been, and that the jury will not be allowed to accept one theory to the exclusion of the other. It is enough if the treatment actually employed had the approval of at least a respectable minority of the medical profession and is recognized by such as a proper method." *Howatt v. Cartwright*, 128 Wash. 343, 222 Pac. 496.

The Sweet Clinic is a corporation engaged in Lewis county in the business of surgery for profit. Pursuant to recommendation of Dr. Sweet, head surgeon of the clinic, and another surgeon also in the employ of the clinic, respondent wife was operated upon between 11:55 a. m. and 1:20 p. m., October 30, 1929, by Dr. Sweet for the removal of a growth or cyst from the left side of her neck. Anaesthetizing the tract affected, Drs. Barr and Sweet removed the growth. When, at eight o'clock that evening, Mr. Brant visited his wife at the clinic, he discovered that her face was distorted. He testified he immediately inquired of Dr. Sweet the cause of the distortion, but the surgeon would not inform him. Mr. Brant testified:

"Q. When did you first see her at the hospital after the operation? A. That evening about a quarter after eight. Q. Just tell the jury what her appearance was at that time? A. Well, her face was just like it is now when I seen her that evening only it had a bunch of bandages over it, over her face. Q. Was there any distortion to her face? A. Well, her eye was out of

shape and her face was dropped down like it is now and her mouth, and she could only wrinkle up her forehead half way. Q. Did you make mention of that fact to anyone at that time? A. No. I didn't. Q. Did you see Dr. Sweet that evening? A. Yes, I went right down and seen him. Q. Did you discuss the matter with him at that time? A. Well, I asked him what caused it; he wouldn't tell me and I asked him if her face would ever come back to normal and he said, no, it never would. He didn't have no time to speak to me; he was called out of the room just at that time and he said there are very few cases of that kind; he said he had one case out at Rochester, a similar case like that; and he couldn't speak to me much more, he avoided me.''

Mrs. Brant did not learn until the evening of the following day, when she was so informed by her husband, that her face was distorted and appeared to be paralyzed. The following day, November 1st, Mrs. Brant returned to her home. She returned to the hospital a number of times thereafter for electrical treatments. In April, 1930, Mrs. Brant consulted another surgeon concerning her condition. That surgeon performed another operation upon Mrs. Brant (in the same tract of the operation performed by Dr. Sweet) after a week or ten days' treatment of, and draining of pus from, the place where the cyst had been removed. That surgeon testified that Mrs. Brant was suffering from complete paralysis of one side of her face; that he dissected down through the old scar tissue of the first operation into the parotid gland, where he found a severed end of a nerve; that

''I followed this scar tissue down into the parotid gland. Q. The scar tissue was where with reference to the incision which had been previously made by Dr. Sweet? A. Well, it was almost directly under the incision. Q. And was there any scar tissue on down deeper which had not been produced by that incision?

A. Deeper in the glands you mean? Q. Yes. A. I didn't see any. Q. Well, if there had been you would have seen it, wouldn't you? A. I guess so. Q. Now, doctor, did you see this facial nerve when you made that second incision? A. I thought I found the facial nerve there; I found a nerve. Q. What condition was that nerve in? A. This nerve was in the scar tissue and was separated probably by an inch, the ends of it. Q. The ends separated by an inch; could you tell whether that nerve had been cut or not, doctor? A. Well, it was in two; I don't know how it got in two. MR. HUNTER: May I ask a question. What nerve are you referring to, doctor? THE WITNESS: I was referring to what I thought was the seventh or facial nerve, the expression of the face. MR. COOK: Q. Doctor, assuming that the facial nerve of Mrs. Brant was severed, would it produce the paralysis which she has at this time? A. Yes.''

He further testified that, if paralysis immediately followed the first operation, ''it was due to trauma of the facial nerve,'' and that a cutting of the nerve would be trauma; that the nerve found by him was in exactly the situation mentioned in the surgical textbooks as the situation of the main facial nerve. In dissecting back towards the source of the nerve, this second surgeon found the other end of the nerve. There was a space of from one-half an inch to an inch between the two ends of the nerve. His attempt to join the two ends was a failure.

Surgeons Barr and Sweet denied that they cut the facial nerve when they operated (the first operation) upon Mrs. Brant. They insist that they operated at a point below and posterior to the parotid gland, and not within an inch of the point where the facial nerve comes out of the foramen. The verdict reflects acceptance by the jury as true the expert testimony that the operation by Drs. Barr and Sweet was within that por-

tion of the tract in which the facial nerve is located. The verdict forecloses any question as to that.

All of the medical expert witnesses, except one of the surgeons who assisted in the first operation, testified that the facial nerve would not be cut if the surgeon performing the operation exercised reasonable skill and care. One medical expert witness, called in behalf of the respondents, testified that, judging from the location of the severed nerve ''and the description given by anatomy, it couldn't have been anything else but the seventh or facial nerve;'' that, if the operating surgeon ''went in there carefully enough, he wouldn't'' cut a facial nerve. Another of respondents' medical experts testified:

''Q. Now by exercising that degree of care and skill ordinarily employed by surgeons in and about Centralia, would a surgeon in operating to remove such a growth cut the facial nerve or sever it? A. Well, I don't believe that he would feel justified in cutting the nerve in working on that kind of a case. Q. The nerve should not be cut, it is not necessary to cut it in performing that kind of an operation? A. No, it is not.''

One of appellants' expert witnesses testified as follows:

''Q. And if, doctor, in operating to remove a branchial fistula it was not necessary to come closer than one inch to the facial nerve and the physician in so operating did cut the facial nerve, in your opinion would he be using due care and skill? A. Of course, if it is not necessary to go within more than an inch to get it, it is not necessary to cut it. Q. No? A. But that depends on circumstances. Q. I am asking you if it was not necessary to go closer than an inch to the facial nerve? A. Then if it is not necessary to go closer than an inch, there is no excuse for cutting it. Q. And if he did cut it under those circumstances, a doctor would be negligent? A. Yes, if it is not necessary to go closer than an inch.''

It may be a correct medical theory that, if paralysis is not observed until thirty-six hours or longer after an operation, and gradually becomes more pronounced until the fifth day, and then the condition improves, it is reasonable to believe that the paralysis resulted from infection, edema, or hemorrhage of other adjacent parts of the tract of the operation. It must be borne in mind, however, that there is testimony, which the jury doubtless believed, that the paralysis was complete shortly following the operation; in fact, it was discovered seven hours after the operation. The paralysis was then complete, and remained complete ever after. The surgeon who performed the second operation and discovered that the facial nerve had been severed, testified the paralysis was permanent.

There is competent testimony that the appellant surgeon operated in that portion of the throat in which the facial nerve is located, and that, in performing the operation of removing the cyst therefrom, it would be inexcusable on the part of the surgeon to sever the facial nerve. There is competent evidence, also, that the facial nerve was severed at the time of the first operation, and that the respondent wife's face was paralyzed as a result of the severance of the nerve. While it is true there is testimony that paralysis from other causes might well follow an operation such as that undergone by Mrs. Brant, if that operation were skillfully and properly performed, there is undisputed competent testimony that, where paralysis results immediately following such an operation and is complete, the paralysis results only from a severance of the facial nerve. There was testimony that the paralysis immediately followed the operation. That testimony was accepted by the jury as true.

There was evidence warranting the jury, which were properly instructed, in finding that the facial nerve of

Mrs. Brant was severed by the appellant surgeon in the performance of the operation for the removal of the cyst, and that the surgeon was negligent—failed to exercise in the performance of the operation such reasonable skill and care as is ordinarily exercised in his profession—in the cutting of that nerve; and that, as a result of such negligence, Mrs. Brant's face was paralyzed.

■ Appellants' motion for a new trial upon the ground of misconduct of the jury was denied. In support of the motion, the appellants submitted affidavits of eight jurors, each averring that he or she did not believe Dr. Sweet cut the facial nerve. Each affiant stated that he or she did not know of any juror who expressed such an opinion. The affiants further averred that one of the jurors stated all doctors were insured, and that any verdict returned would be paid by the insurance company.

Upon motion for a new trial, the verdict cannot be impeached by affidavits of the jurors as to matters which inhere in the verdict. The jurors cannot impeach their verdict by affidavits to the effect that they disbelieved or were mistaken as to certain testimony.

■ The statement of facts does not disclose, nor do appellants contend, that one word was said during the trial concerning liability insurance. The affidavits filed by appellants to the effect that, before the finding of the verdict, the jury discussed the question of liability insurance which physicians and surgeons have to protect them against payment of damages for malpractice, were controverted by counter-affidavits filed in behalf of respondents. All of the affidavits were considered by the trial court in passing upon appellants' motion for a new trial. The affidavits were in conflict and we hold with the trial court that the verdict of the jury was not successfully impeached.

It is next contended that the appellant Sweet Clinic, being a corporation, cannot practice surgery, therefore it can not be held to respond in damages for malpractice by one of its surgeons.

The contention is without merit. The Sweet Clinic is a corporation carrying on a medical and surgical business for profit, and is liable for malpractice of the operating surgeons, who in the case at bar were employees of the corporation.

"If, on the other hand, the company was conducting a hospital with its own physician for the purpose of deriving profit therefrom, or if it contracted with the appellant to furnish him with the services of a competent physician, and to properly treat him in case of an injury, it would be liable for the negligence or want of skill of its physician in attending him." *Richardson v. Carbon Hill Coal Co.,* 6 Wash. 52, 32 Pac. 1012, 20 L. R. A. 338.

"It is not authority for the broad proposition that an employer, where he maintains a hospital for profit, or contracts, for a consideration, to treat his sick and injured employees, is not liable for the malpractice of the physician or surgeon he employs, notwithstanding he exercised due care in the selection of such physician or surgeon. On the contrary, the case, as a whole, is authority for the opposite contention; and if in this case the respondent did contract, for a consideration, to treat its employees for any injury they might receive while in its employ, it is liable for the malpractice of the surgeon employed to treat the appellant; and this question, as we say, should have been submitted to the jury." *Sawdey v. Spokane Falls & N. Ry. Co.,* 30 Wash. 349, 70 Pac. 972, 94 Am. St. 880.

The other assignments of error have been considered, and found not to possess substantial merit.

The judgment is affirmed.

TOLMAN, C. J., MAIN, HOLCOMB, and BEALS, JJ., concur.