[No. 34496. *En Banc.* June 18, 1959.]

Roy E. Richison *et al., Respondents,* v. Dr. Leslie L. Nunn *et al., Appellants.*[1]

[1]Reported in 340 P. (2d) 793.

*McMullen, Snider & McMullen,* for appellants.

*Kennett, McCutcheon & Soderland* and *William C. Klein,* for respondents.

ROSELLINI, J.—This is a medical malpractice action. The complaint alleged that the defendant doctor (who will be referred to as the defendant) had negligently sewed a nerve into soft tissue adjacent to the surgical incision which he made for a hernia operation performed upon the plaintiff wife (who will be referred to as the plaintiff) in June,

1952; that he negligently failed to discover that he had so sewed a nerve into soft tissue; that he did not possess and use, in the performance of the hernia surgery, the knowledge and care ordinarily and customarily possessed and used by surgeons in Vancouver and similar communities in that he failed to locate the nerves in the area of the operation and in that he failed to avoid sewing the nerve into the adjacent soft tissue and injuring the nerve. It was further alleged that the plaintiff, by reason of the defendant's conduct was caused to suffer excruciating and agonizing pain of which the defendant was promptly advised, and that the defendant then and there failed and refused to make an examination to determine the cause of such pain; that the defendant refused daily to examine the plaintiff to determine the cause of her excruciating pain, but on the contrary, required her to stand and walk and negligently failed to treat said injury and the resulting pain and suffering. As a result of the defendant's negligence, it was alleged that the plaintiff had become permanently disabled. Damages in the sum of $180,700 were asked.

After a lengthy trial, the cause was submitted to a jury, which returned a verdict in favor of the plaintiff. The defendant appeals from the judgment entered thereon, assigning error to the denial of his various motions directed to the insufficiency of the evidence to sustain the verdict.

A challenge to the sufficiency of the evidence, of course, admits the truth of the opposing party's evidence and all inferences that reasonably can be drawn therefrom, and requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the party against whom the motion is made. *Traverso v. Pupo*, 51 Wn. (2d) 149, 316 P. (2d) 462.

The burden was upon the plaintiff to prove one or more of the allegations of negligence and that such negligence was the cause of her disability. It is well settled that, before a physician or surgeon may be held liable for malpractice, he must have done something in the treatment of his patient which the recognized standard of medical prac-

tice in his community forbids in such cases, or he must have neglected to do something required by that standard. In order to sustain a judgment against a physician or surgeon, the standard of medical practice in the community must be shown, and, further, that the doctor failed to follow the methods prescribed by that standard. Negligence on the part of the physician or surgeon by reason of his departure from the recognized standard of practice must be established by medical testimony. An exception to this rule is recognized where the negligence is so grossly apparent that a layman would have no difficulty in recognizing it. *Hurspool v. Ralston,* 48 Wn. (2d) 6, 290 P. (2d) 981, and cases cited therein. In such cases the courts, in effect, apply the doctrine of *res ipsa loquitur* which shifts the burden of proof to the defendant when the injury is one which does not ordinarily occur without negligence. *Olson v. Weitz,* 37 Wn. (2d) 70, 221 P. (2d) 537. The facts of this case do not bring it within this exception, as the following summary of the evidence will show.

The plaintiff's evidence, which we accept as true, tended to show that prior to the herniorrhaphy which the defendant performed in June, 1952, she had been in reasonably good health and had recovered without incident from a hysterectomy and ovariotomy which the defendant had performed in 1951.

The plaintiff's hernia developed in the left inguinal area as a result of a fall which she sustained on the basement stairs in her home. After a period of observation and conservative treatment, the defendant recommended surgery, to which the plaintiff consented. She was told by the defendant that this would be a comparatively simple operation from which she should recover quickly. The defendant and his assistant testified to the procedure which he followed in performing the herniorrhaphy, a procedure which his medical witnesses testified was proper and according to the accepted standard. The plaintiff offered no medical evidence to the contrary.

Also, the plaintiff offered no medical evidence that the post operative care given the plaintiff, as shown by the

hospital records, was less than or different from that required by the accepted standards of practice. The only medical evidence on this matter was produced by the defendant, whose witnesses testified that the procedures conformed to the applicable standard.

The plaintiff, however, testified that when she awoke from the anesthetic, she was screaming with pain, and the defendant conceded that this was not the usual reaction. There was also evidence in the hospital records that she complained frequently of pain in her leg and operational area during her stay in the hospital. She testified that though she complained to the defendant of intense pain, he did not examine the incision but simply explored the area by hand pressure without removing the bandage. (The plaintiff makes much of this testimony and the jury's right to believe it; however, the record is devoid of any evidence that such an examination would have revealed anything helpful in diagnosing the cause of the plaintiff's distress.) She testified further that the defendant told her to get up and walk and that if she would do so, the pain would go away. The defendant admitted that he had so admonished her, in accord with his usual practice of encouraging early ambulation. There was no evidence that this practice was contrary to the standard or that it was improper in the plaintiff's situation.

After the plaintiff returned home from the hospital and the stitches had been removed, she continued to suffer pain in her leg and complained of this to the defendant. He diagnosed her complaint as left sciatica and committed her to the hospital for ice-bag applications and diathermy. If this diagnosis was unwarranted at the time or if the treatment given was improper or had any adverse effect on the plaintiff's condition, such facts are not disclosed by the record. The testimony of Dr. Boersma, the doctor whom she consulted a few weeks later and who remained her physician until the time of trial, indicates that the diagnosis was not unwarranted by the symptoms she displayed at that time. He stated that, on his first examination, his impression was

that she might be suffering from some type of sciatic neuritis "secondary to something else."

After her release from the hospital, according to the plaintiff's testimony, she continued to complain of pain, but the defendant told her there was nothing wrong with her and that her husband humored her too much, and that if he did not stop it, she would never "come out of it," that she would lose her mind entirely and he would send her to Steilacoom. She conceded that, in spite of this casual diagnosis, he had sent her to an X-ray therapist, but she received no relief from the first treatment and did not return for her second appointment. The defendant recommended she see a psychiatrist and told her he could do nothing further for her. She refused to take this advice and went instead to Dr. Boersma, also a general practitioner in Vancouver. This was five weeks after her herniorrhaphy.

Dr. Boersma, like the defendant, was unable to satisfactorily diagnose the plaintiff's trouble and referred her to a neurologist, who concurred with the defendant's conclusion that the cause was subjective and found no evidence of involvement of the femoral nerve or complication in her surgical procedure. His recommended procaine injections having produced no satisfactory relief, the plaintiff was referred to an internist in Portland, who could find no explanation for her problem and could think of no reason why it should be caused by the surgery.

A few weeks later the plaintiff was referred to Dr. Frewing, a surgeon, who performed an exploratory operation in the region of the scar, and found an unusual amount of scarring (there is no suggestion that this was due to any negligence on the part of the defendant) and a small structure partially encased in the scar tissue and adherent to Poupart's ligament. In order to discover the nature of this structure, he performed a pinching test which revealed it to be a motor nerve which was not functioning below the area of encasement. Dr. Frewing formed the impression that the nerve might be in part sensory ("superficial cutaneous of the thigh"). His explanation of the result of the

pinching test was given in these words: "I felt that this was part of the scarring process that was in this area [indicating] and this particular nerve was bound down a little more firmly than some others."

A microscopic examination of a specimen of the excised tissue which Dr. Frewing submitted to the University of Portland pathology laboratory revealed a small nerve encased in scar tissue and a large amount of suture material. While the plaintiff showed improvement after this operation, her symptoms later returned, and there was no evidence that any of the doctors attributed her disability to the adherence of the nerve to the ligament, or attributed this adherence to the manner in which the operation was performed.

During the following year and a half, the plaintiff was hospitalized with various illnesses. Meanwhile she continued to complain of pain in her left leg but was not treated for this condition when she was hospitalized for other unrelated conditions. Then on March 6, 1954, the plaintiff was referred to a neurologist at the University of Oregon, who, for the first time, diagnosed her condition as reflex dystrophy of causalgic type, with the scar area as the probable source of irritation. (This is significant to the plaintiff's case, because it is her theory that she was suffering from reflex dystrophy from the time of the operation and that it was caused by the encasement of the motor nerve.)

After the neurologist, Dr. Livingston, expressed his opinion that the plaintiff was suffering from a reflex sympathetic dystrophy, with the scar area as the probable source of irritation, she was examined by Dr. Haugen, Dr. Livingston's associate, who differed with Dr. Livingston to the extent that he thought the obturator nerve was involved. The two doctors recommended procaine injections, the same treatment which had been recommended and tried without success in October, 1952.

July 20, 1954, the plaintiff was referred to Dr. Davis, a neurosurgeon, for evaluation. His opinion was that she was suffering from an irritative nerve phenomenon associated

with involvement of branches of the femoral nerve at the time of her initial surgery. "She is," he reported to Dr. Boersma, "developing many of the findings of a causalgia or at least a reflex sympathetic dystrophy." The doctor testified that the expression "involvement of branches of the femoral nerve" described a reflex mechanism and did not mean that a nerve had been injured.

After the examination by Dr. Davis, the plaintiff was admitted to the hospital for a tonsillectomy, and a month later, she was readmitted with symptoms of extreme weakness, dizziness, weakness of the right arm, and pain in her left leg. No diagnosis was made on that admission. December 13, 1954, an electroencephalogram was made and was reported normal. On January 18, 1955, a left lumbar sympathectomy was performed by Dr. Davis, after a sympathetic block had produced some relief. This operation, regarded as often beneficial in the relief of reflex sympathetic dystrophy, afforded no lasting relief to the plaintiff.

On April 21, 1955, she was again admitted to the hospital for three days this time, with a diagnosis of anxiety tension state. On September 7, she was given a clinical trial of ultrasonic therapy for the relief of pain which had to be discontinued because it produced colonic attacks. She was again hospitalized from September 14, to October 10, 1955, with a paralysis of the entire left lower extremity. This was diagnosed by a psychiatrist as conversion hysteria and was successfully treated by hypnosis. Apparently, this was the only psychiatric treatment ever administered to the plaintiff.

Thereafter, the plaintiff's symptoms continued and her doctor, at a loss to prescribe further treatment, referred her to the Mayo Clinic, Rochester, Minnesota. After her examination there, he received the following report from Dr. John G. Mayne of that clinic:

"Thank you for referring your patient, Mrs. Roy E. Richison to the Mayo Clinic. It was my pleasure to conduct her general examination and at my request she was seen by Doctor Parker of the department of neurology, Doctor Uihlein of the department of neurosurgery, Doctor Hines

of the department of peripheral vascular diseases, Doctor Hunt of gynecology and Doctor Rome of the department of psychiatry. As you are fully aware of her primary complaint, I will not repeat this in detail. I shall state in brief that she told me her primary complaints were recurring, sharp jabbing pain involving particularly the inner aspect of the left leg from the "incision" down and laterally "up" the leg to the thigh. Secondarily, she complained of migratory areas of burning sensation like pins and needles over the entire left leg and thirdly, she complained bitterly of the appearance of the left leg with its dependent edema.

"Many of the details of her past history strongly suggested hysterical symptoms. Thus, she mentioned that $2\frac{1}{2}$ years ago she had felt so 'weak' one morning that she went back to bed and at noon was found by a neighbor so weak that she 'just didn't care what was going on.' She tells me that she was a patient in the hospital for four months at that time and was told that she had had a heart attack.

"She has had shaking spells ever since she had had her 'nerve injured in 1952.' The duration of the spells will vary from five minutes to a few minutes more or less and may recur many time per day. She also complained bitterly of dyspareunia due to pain in the left thigh and that this has been another source of great concern to her and to her husband.

"The significant findings on her physical examination, in addition to the evidences of her previous surgery, were the change in size of the left lower extremity which was definitely larger than the right and was slightly more cyanotic than the right. She had a marked 'touch-me-not' reaction involving the entire left leg which made examination somewhat difficult. There was some lipedema bilaterally, the left leg was warm and dry, and the examination was otherwise within normal limits.

"The routine laboratory studies of her blood and urine were within normal limits. A Papanicolaou smear of the cervix was negative. An x-ray of the chest was negative as was the x-ray of the left leg, including the foot and ankle.

"Doctor Hines, who saw Mrs. Richison, felt that from her history she may well have had an ileofemoral thrombophlebitis, postoperatively and that the changes resulting from this were superimposed on the mild lipedema now, including the edema and enlargement of the left lower extremity, was due to a combination of a mild chronic venous insufficiency and lipedema. He felt that there was an ele-

ment of 'post-phlebitic neurosis' but that this did not explain all of her distress. We advised that she wear·an adequate elastic support but felt that she would not do this because of her complaints of hypersensitivity of the extremity.

"Special studies by Dr. Parker of the department of neurology were completely negative, and it was his impression that her symptoms were primarily those of a conversion hysteria. Doctor Rome of the department of psychiatry agreed that hers was primarily a hysterical reaction to her original injury and he advised that we continue the use of thorazine, 50 mg. four times daily, for some additional help. Mrs. Richison seemed quite upset at our recommendation that she be seen by a psychiatrist and I doubt that she will follow any of the recommendations we have made.

"I am sorry that we could not be of more help to Mrs. Richison in solving her problems. I do feel that she will have the best chance of gaining relief of her symptoms if she will accept psychiatric help."

Shortly before the trial, the plaintiff was examined by two Portland doctors at the request of the defendant. X rays which they took showed no demineralization of the bone. The following day she was readmitted to a Vancouver hospital, where she remained throughout the trial. She appeared at the trial only once, when she was brought, on a stretcher, to give her testimony.

In an effort to substantiate her theory of the cause and nature of her condition, the plaintiff took the deposition of a Dr. Bonica of Tacoma, who had written a book called "The Management of Pain," first published in 1953. In this treatise, Dr. Bonica discussed at some length the disease known as causalgia and the disease known as reflex sympathetic dystrophy, of which causalgia is a particularly severe type, rarely occurring except as a result of battle wounds. Dr. Bonica, treated as an adverse witness by the plaintiff's counsel, testified at great length about the nature and causes of this disease and the theories regarding it. *He stated that the reason he wrote the book was because the matters contained in it were not at that time standard practices, and cases of reflex dystrophy were, in many instances, not recognized by the average practitioner, nor did he know*

*how to diagnose them nor did he know much about treat-*
*ment.*

Dr. Bonica testified that a literal translation of the term reflex sympathetic dystrophy is "that there is a dystrophy consequent to sympathetic hyperactivity which results as from an abnormal reflex mechanism." One form of reflex sympathetic dystrophy is due, he said, to a major injury to a major peripheral nerve. Other forms of reflex sympathetic dystrophy are or may be due to injury to various structures, usually in the extremities, and the processes initiated by irritation of nerve endings which cause a disturbance in the spinal cord and result in signs of symptoms. None of the mechanism of causalgia, he said, has ever been proved but certain treatments have given relief. The doctor's own theory was that tissue damage, whatever may be the agency producing the damage, initiates a reflex disorder which in some way involves the sympathetic nervous system. In his own experience, he had found that certain types of minor reflex sympathetic dystrophy may be produced by *surgical scars,* and by *damage to small peripheral nerves,* and that he had found it following surgical amputation of fingers, excision of the ganglia of the wrist, plastic operations of the hand or foot, insertion of an infusion needle into the median nerve, extravenous injection of pentothal sodium, and injection of alcohol into or around a nerve. A trauma, whether it be mechanical or chemical, may produce this condition. However, injury to a motor nerve would not produce it. He testified that an early diagnosis and treatment of the disease is important, since if it progresses to the point where demineralization of the bones occurs (as often happens), its course is irreversible.

The symptoms characteristic of reflex sympathetic dystrophy, according to Dr. Bonica's expert testimony, are, a burning pain in the early stages, discoloration of the skin, and localized swelling, followed by a lessening of the pain and edema and the occurrence of trophic changes (changes in the skin). In the third stage, pain disappears and the trophic changes become more marked. There is demineraliza-

tion of the bones, detectible by X ray, accompanied by limitation of motion. This third stage is the stage in which the course of the disease becomes irreversible. Development of the disease can be prevented in some instances, he said, by (1) treatment at the site of injury, (2) early and adequate relief of pain with analgesic block, and (3) proper psychologic support of patient.

Dr. Bonica testified that he was not a surgeon and not familiar with the standard of medical practice applicable to herniorrhaphy and proper postoperative care. He did testify that in his opinion when a patient complains of pain, the doctor should not assume that it has no organic basis. He also testified that if a patient is actually suffering from reflex sympathetic dystrophy, it will not help him to threaten to put him in an insane asylum.

An examination of this evidence reveals no basis on which the jury could determine that the defendant's surgical procedure and treatment of the plaintiff was not according to the accepted standard or that his negligence caused the condition which developed in her leg. There is evidence that the scar may have been the irritant which set up the reflex reaction (if the diagnosis of reflex sympathetic dystrophy was correct) or that injury to peripheral nerves, if there were such injury, may have caused it. But there is no evidence that the scarring or the supposed injury to nerves was the result of negligence.

Dr. Bonica testified that the average practitioner does not have the knowledge to recognize reflex sympathetic dystrophy, and the record of diagnoses in this case amply supports that testimony. Can it be said then, that the defendant was negligent in failing to make this diagnosis— a diagnosis which was first made two years after he last saw the patient? We think that clearly it cannot. It should be remembered that immediately after her operation, pain was the only symptom of which the plaintiff complained. It was not until other symptoms of reflex sympathetic dystrophy began to develop, long after she had discontinued the services of the defendant, that such a diagnosis was

made. Doubt is thrown on the correctness of this diagnosis by the fact that, five years after the onset of her pain, she had not developed the characteristics of the third stage of the disease, that is, demineralization of the bones and subsidence of pain.

Neither can the defendant be held liable for failing to properly treat a disease which he could not reasonably be required to recognize. It is significant that the treatment recommended by the Mayo Clinic was essentially that recommended by the defendant, namely, psychiatric assistance. The neurologist at this clinic found no nerve involvement, and another doctor attributed her ailment in the first instance to a postoperative iliofemoral thrombophlebitis. (The term was not explained at the trial, but according to Blakiston's New Gould Medical Dictionary, this is an inflammation of the veins in the iliofemoral area resulting from a thrombus or clot.)

There is no medical opinion in the record, nor any other evidence, that had the defendant used a different surgical procedure, or made a different diagnosis of the plaintiff's postoperative trouble and prescribed a different treatment, her disability would have been avoided or corrected. The evidence simply discloses a result which has baffled general practitioners and specialists alike, and for which no treatment has been successful.

The plaintiff admits the lack of direct medical testimony but contends that since a nerve was found encased in the soft tissue, and injuries of nerves may cause reflex sympathetic dystrophy, and there was evidence that the plaintiff developed reflex sympathetic dystrophy, the "chain of circumstances" rule should apply. This rule is set forth in *Crouch v. Wyckoff*, 6 Wn. (2d) 273, 107 P. (2d) 339, wherein we said:

"We recognize the rule that, in a malpractice action, it is not necessary to prove negligence by direct and positive evidence, but it may be proved, in certain cases, by a chain of circumstances, from which the ultimate fact required to be established is reasonably and naturally inferable; and in such cases, it is unnecessary to have the opinion of persons

skilled in the particular science to show negligent treatment, but the facts alone prove negligence. [Citing cases]. However, a reading of the cited cases will show that, under the facts as established in each case, the negligent act, such as leaving a sponge in the body after an operation, or a spring from an instrument used by the doctor, was so apparent that no expert testimony was necessary to establish the negligence, that being established by the facts alone."

 The rule in malpractice actions is that a surgeon is not liable merely because of a bad result. He is not responsible in damages in a malpractice suit if the treatment which he employs is that which is recognized and approved by those reasonably skilled in his profession, practicing in the same neighborhood and in the same line of practice, and if he administers that treatment with a degree of skill and diligence such as practitioners ordinarily exercise in like cases. *Crouch v. Wyckoff, supra; Brant v. Sweet Clinic,* 167 Wash. 166, 8 P. (2d) 972.

The testimony of all the medical witnesses who were questioned concerning the technique employed by Dr. Nunn was to the effect that, in treating the respondent, he used that degree of care and skill required by the above rule, and there is no testimony to the contrary.

The difficulty with the plaintiff's theory is that the only evidence of negligence is the bad result which followed the operation, that is, the continuing pain and subsequent edema and changes in the appearance and temperature of the skin. On the basis of this result, plus the fact that a nerve was found encased in scar tissue, and an expert's opinion that damage to a nerve may cause reflex sympathetic dystrophy, the plaintiff contends that the jury was entitled to infer that the operation was negligently performed and that it was this negligence which produced the ensuing pain and other symptoms. This assumes that the jury could determine the cause of her disability when the physicians, including specialists, who examined her subsequent to the operation were unable to agree on its cause or even a diagnosis.

 The illogic of this assumption illustrates the va-

lidity of the principle that a bad result is not, in itself, evidence of negligence. As this court said in *Brear v. Sweet*, 155 Wash. 474, 284 Pac. 803, the law is well settled that facts relating to difficult surgical operations call for knowledge far beyond the ordinary layman, and resort must be had to testimony of expert witnesses for light on the subject of whether or not the defendant has been guilty of negligence.

The testimony of other physicians that they would have followed a different course of treatment than that followed by the defendant, or a disagreement of doctors of equal skill and learning as to what the treatment should have been, does not establish negligence. In such cases, the court must hold that there is nothing upon which the jury may pass, the reason being that the jury may not be allowed to accept one theory to the exclusion of the other. *Fritz v. Horsfall*, 24 Wn. (2d) 14, 163 P. (2d) 148, and cited cases.

This is not a case in which the medical men called to testify for the plaintiff are in agreement with each other as to the diagnosis or cause of the plaintiff's condition, but are in disagreement with those who testify for the defendant. In such a case, the jury is entitled to choose between the conflicting testimony. But in this case, the doctors called to testify on behalf of the plaintiff were not in accord in their diagnosis of her condition, much less in their theories of its cause, and Dr. Frewing, in anticipation of an exploratory operation, went so far as to state: "I hardly know what one could expect to find to explain such a picture as the patient presents."

What was found was a small branch nerve, which the doctor concluded was a motor nerve, encased in scar tissue, a piece of suture in its vicinity, and an unusual amount of scarring. None of these findings was attributed by this or any other doctor to improper operational procedure, nor was it ever shown that the encased nerve was the source of the plaintiff's trouble. If it was a motor nerve, it could not have been the cause of her pain according to the testi-

mony of the plaintiff's expert, Dr Bonica. While she experienced some relief after the exploratory operation, in a short time all of her symptoms returned. There was no explanation given as to why the exploratory operation would give temporary but not permanent relief.

The testimony of Dr. Bonica presents interesting information regarding the disease known as reflex sympathetic dystrophy, but it affords no basis for a finding that the defendant was negligent. Dr. Bonica did not testify that the disease results from negligence in the performance of operations and other medical procedures but simply that the injury necessarily involved in the operation may produce this result. The reason why it does in some cases, and does not in the majority of others, so far as the evidence in this case discloses, is not known.

A jury would have to resort to speculation and conjecture in order to find that the plaintiff's symptoms were the result of the encasement of the motor nerve in scar tissue and that such encasement was due to the employment of an improper operational technique on the part of the defendant or the performance of the operation in a negligent manner. This is a type of speculation which, so far as the record reveals, was not indulged in by any of the doctors who examined her for the purpose of diagnosing and treating her condition.

The plaintiff cites the case of *Marlowe v. Patrick*, 181 Wash. 647, 44 P. (2d) 776, and urges that, upon the authority of that case, the verdict of the jury should be sustained. In *Marlowe v. Patrick, supra*, the defendant had performed a mastoidectomy and in the performance of the surgery had unnecessarily injured the facial nerve. The court held that the jury was entitled to infer that the injury to the nerve was caused by negligence, rather than by accident. Among the features which distinguished that case from this are: (1) that there was medical testimony that the facial nerve was not necessarily involved in the operation; (2) that the source of the plaintiff's trouble was undisputed; and (3) that the defendant admitted to the plaintiff, according to

her testimony, which the jury was entitled to believe, that he had made a mistake in the operation.

In this case it is true that, on cross-examination, the defendant acknowledged that a surgeon, in performing a herniorrhaphy should avoid injuring the femoral nerve or its branches because of the harmful results which may follow. This cannot be taken as an admission that the standard of practice required a surgeon to avoid injuring any nerve branch, however, since the defendant also testified, and the other medical witnesses who were questioned concerning the matter concurred that it is impossible to avoid cutting and disturbing the branch nerves in the area encompassed by the incision that is necessary in an operation of this type. Even a layman would recognize the truth of this. Furthermore, there is no medical testimony, or any other testimony, to the effect that the nerve branch which was found encased in scar tissue, which was so small that it was not visually identifiable, was in an area not properly involved in an operation for the repair of a left inguinal hernia. The record is also devoid of any admission by the defendant that he sewed the nerve in question into the soft tissue or injured it in any way. So far as the evidence shows, it is as likely that the nerve had become encased through the natural formation of scar tissue as it is that it was encased by suturing. In fact, it was the impression formed by the surgeon who later explored the area that the encasement was the result of scarring. Finally, there was no agreement of doctors that an injury to this or any other nerve was the cause of the plaintiff's trouble.

This court recognizes that it is difficult to obtain medical testimony to substantiate a plaintiff's claim in a malpractice suit, as physicians are reluctant to testify against each other. But this does not obviate the necessity of such testimony where the fact of negligence is not apparent to the layman. Until some better system of determining the issue is evolved,[2] plaintiffs will have to produce such evidence if they are to prevail in suits of this nature.

[2]The problem involved and possible solutions are discussed at length in 30 Temple Law Quarterly 359-461 (Summer 1957).

There is no question but that the plaintiff is suffering and has suffered great pain and discomfort, but it is apparent the jury allowed the natural sympathy which it undoubtedly felt for the plaintiff's misfortune to lead it to make assumptions which were not justified by the evidence. The plaintiff having failed to sustain the burden of proving that her disability was the result of the defendant's negligence, the judgment must be reversed.

It is so ordered.

WEAVER, C. J., MALLERY, HILL, DONWORTH, and OTT, JJ., concur.

HUNTER, J. (dissenting)—As stated by the majority, in order to sustain a judgment against a physician or surgeon, the following must be shown, (1) the standard of medical practice in the community; (2) that the physician or surgeon failed to follow the methods prescribed by such standard; (3) that the negligence on the part of the physician or surgeon by reason of his departure from the recognized standard of practice was the cause of the disability. The foregoing elements must be established by medical testimony unless they are so apparent that a layman would have no difficulty in their recognition.

The majority conclude that there was no medical evidence to establish these elements, as asserted by the respondent, as applied to the instant case, and that no exception to the rule can be here applied. I disagree.

A challenge to the sufficiency of the evidence, as stated by the majority, admits the truth of the opposing party's evidence and all inferences that reasonably can be drawn therefrom; and requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the party against whom the motion was made. *Traverso v. Pupo*, 51 Wn. (2d) 149, 316 P. (2d) 462.

Applying these rules, the answer to the proper determination of the case lies in the record which will be examined as it applies to the proof of the above elements essential for the respondent to prevail.

Evidence of standards of medical care existing in Vancouver at the time of the asserted violation appears in the record. Dr. L. L. Nunn (who will be referred to as the appellant) admitted in paragraph VII of his answer as follows:

"Defendants deny each and every allegation of Paragraph VII of plaintiffs' complaint, save and except that they admit that under the standards of care required of physicians and surgeons in Vancouver, Washington, it was and is the duty of a physician performing a surgical operation for the removal of a femoral hernia to avoid injuring the femoral nerve and to avoid sewing it into the incision resulting from such operation."

The appellant testified as follows:

"Q. . . . I notice in your answer, doctor, Paragraph 7, the answer you swore to in this case, you say this: 'Admit that under the standards of care required of physicians and surgeons in Vancouver, Washington, it was and is the duty of a physician performing a surgical operation for the removal of a femoral hernia to avoid injuring the femoral nerve and to avoid sewing it into the incision resulting from such operation.' Now, my question is, why does the standard of practice place that duty upon the surgeon? A. Well, simply because he wants to avoid any injury to structures which he shouldn't injure. Q. Is it fair, doctor, to say that when you perform surgery to repair a femoral hernia in a female that you know that if you sever the femoral nerve or one of its branches, and you have mentioned certain branches, or sew it into the tissues adjacent to it, by that I mean the femoral nerve, into the tissues adjacent to the area, or damage it or the branches of it which you have mentioned, that your patient will in all probability suffer some undesirable results such as paralysis, anesthesia, paresthesia, or inflammation of the nerve or the branch affected, is that fair? A. Fair enough."

The foregoing evidence establishes an accepted standard by which the appellant was required to abide in the performing of the herniorrhaphy upon the respondent Vera Richison. Evidence of the violation of the above standards in the performance of the herniorrhaphy by the appellant appears in the record as follows:

Dr. H. Frewing testified:

"Q. Now your post-operative diagnosis of scarring left groin, extensive, tell us what you found that led you to make that portion of your post-operative diagnosis? . . . A. As I dissected below the skin and towards the deeper structures in this operative area, I found that there was more than the usual scar formation in this region below Poupart's ligament. As we go through tissue in this area, we are accustomed to find a good deal of fatty tissue. There are many additional fibres of lymph channels and lymph nodes, *and it is unusual to see firm attachment of the skin to these deeper structures.* That was the first note I made that there was *more than the usual scar formation below Poupart's ligament in the region* and here I would like to interject a correction for the typographical work, perhaps it was my dictating and perhaps was the stenographer's fault, but in any event, the word 'vasa ovalis' is used. The —that should be 'fossa ovalis.' f-o-s-s-a. Q. I think I developed that before. A. Yes, however, the fossa ovalis is an anatomical area overlying the femoral artery and vein just below Poupart's ligament, and I use the term here to indicate the area where I found more than usual scarring below Poupart's ligament. I extended that remark in my report, extending along the nerves and vessels. *That means as I went deeper in my dissection in this operative area, I found that this scarring extended down around the vessels and nerves. Q. And how far down — what was the depth to which you did go in this dissection, measuring from the skin downward? A. I would estimate perhaps one and a half inches. It was to a layer deep to behind the vessels.* Q. Then after you exposed the femoral nerve and, I assume, when you are using that term here, well, I won't assume anything. I'll ask you. When you use the term femoral nerve in this exhibit, Number 11, to what did you refer? A. I refer to the femoral nerve trunk and *its principal branches in that area.* Q. And did you visualize the femoral nerve as you have thus defined it to us? A. Yes, sir. Q. What did you find? A. *I found there was no evidence of possible scarring or involvment of the nerve except for one branch which seemed to be adherent under Poupart's ligament.* I am hard put to describe accurately to you what Poupart's ligament looks like. It's a thick layer of — oh, not quite tendon. It's fascia-like tissue, maybe that doesn't mean any more. It's a firm, gristly type of material that goes across the groin here (indicating). Behind that I

found one branch of nerve which was different from the others. Q. Now where with reference to the lower border of Poupart's ligament, did you find this condition that you described? A. My, — excuse me, as I refresh myself. I note that I released this nerve from the posterior border of Poupart's ligament, because the change in terms there, that's why I asked you to explain, sir. Q. Well, if this is the ligament, sir, I shouldn't use anything that big, and I know it's not this big, true, but posterior means the back? A. That's right, sir. Q. And what I'm talking about, elevation, I'm describing lower border as being part part nearest the feet, the upper border being the upper part nearest the head. *Now where on the back side or posteriorly, where with reference to the lower border did you find this situation? A. I would say I found it in that area where normally one would expect to find the femoral nerve, which is towards the side laterally from the femoral artery and at a point approximately halfway from the anterior-superior spine to the lower attachment of the symphysis of the Poupart's ligament.*" (Italics mine.)

Dr. Frewing further testified:

"Q. What did you observe as to what — as to the manner of adherence of this nerve to the ligament? A. I have no detailed note as to the exact manner of attachment. I would assume from my record that it was attached in ordinary fibrous scar tissue such as I had been contending with throughout the remainder of the exploration of this area. Q. How close was the nerve to the ligament itself? A. I have noted that I released it from the posterior border of Poupart's ligament. That would mean that it was immediately adjacent to the ligament. Q. For what distance, and it was surrounded, as I understand it, with scar tissue? A. That would be a reasonable feeling. Q. You released it in what method? What did you do to release it? A. We use instruments in our operation, I would think. Now, I do not have note as to the particular instrument I used at this time, but I would be using scissors or hemostats or thumb forceps or even sometimes a scalpel, a knife. Q. And do I understand that you cut scar tissue in some manner or other to release the nerve? A. Yes, sir. Q. And what length of the nerve was there imbedded in the scar tissue? A. I have to rely on memory there. *I would say perhaps one-quarter inch.* Q. Now, you took specimens of this tissue and caused them to be sent to the laboratory for evaluation

and diagnosis, didn't you? A. I took three specimens from this operation and sent them to the pathological laboratory. Q. Now, after you had released this nerve, during this surgery, did you make some test of the nerve? A. Yes, sir. Q. Describe what you did and — A. As I explored this area, I ran into various strands which it was impossible with the naked eye to identify positively. They could have been lymph channels; they could have been vessels, either veins or arteries; they could have been fibrous tissue or they could have been nerve. In the case of this particular object which I had, I did what I had done on some of the other fragments or strands I had in front of me, I pinched it lightly with the hemostat or a forcep — that is an instrument we use in surgery to grasp small objects or vessels, to control bleeding, and we acquire a certain facility of pinching gently with it. When I pinched this nerve, there was a contraction of one of the muscles in the front of the thigh. Q. That indicated that you then and there — A. That I was dealing with a nerve, sir. Q. You were dealing with a motor nerve, sir, weren't you? A. Yes, sir. Q. And that motor nerve goes to a muscle and not to the skin surface, doesn't it? A. Not necessarily, sir, that segment which I was stimulating was going to a nerve — going to a muscle, but I had no assurance in this area that I didn't have a mixed nerve which would have parts going to the skin and to the muscle. Q. Fine, very good, sir. Mixed nerves, then, carry both motor and sensation fibres, don't they? A. Yes, sir. Q. So that an injury to a mixed nerve may produce sensation of pain and may also impair muscle function? A. Yes, sir. Q. Now I assume that you have — we'll put it this way. When you came to sewing up, suturing, I believe you doctors call it, the wound that you had to make for this operation, what type of needle did you use, what shape is the needle? A. That depends, Mr. Kennett, on the area in which we are working, down deep we use a curved needle, what we call a half curve, semi-circular type needle. Q. Like this, Doctor, (indicating)? A. That order; perhaps not quite so much curve, but a curving needle. Q. So that if you put a curved needle, it has the suture material attached to it, doesn't it? A. Yes, sir. Q. Cotton, silk, whatever the surgeon has elected to use? A. That is right. Q. If you go through a ligament with that curved needle, the purpose of the curve is so that the business end — A. Sharp end. Q. — will go through and then you turn it and then it comes back out and you make the suture fast? A.

That is right. We grasp the needle when it comes out and pick it up with our instrument. Q. And then tie your knot? A. Tie the knot. *Q. So that if there was this nerve lying right down close and adjacent to the structure to which you put your curved needle, it would be quite simple matter to pick that nerve up and sew it in there, wouldn't it?* A. With your assumptions, yes." (Italics mine.)

The findings of Dr. Frewing appear in the hospital record (exhibit No. 11) as follows:

"Findings: There was more than usual scar formation in the low Poupart's ligament in the region of the vasa ovalis and extending along the nerves and vessels. There is no evidence of herniation. The external oblique fascia was tightly closed and there was no evident defect, neuroma or other pathology underlying the external oblique. The vein and the artery were both soft, of normal consistency and readily compressed. There was no evidence of unusual communication or extravasation. The artery in particular, had considerable scarring around. The femoral nerve and its branches was exposed, the ligaments and then through the femoral ring into the retroperitoneal area. *There was no evidence of possible scarring or involvement of the nerve except for one branch, which was apparently in part, superficial cutaneous of the thigh and in part, motor to the upper portion of the sartorius muscle. When this branch was released from the posterior border of Poupart's ligament, there was some thickening.* Compression of the nerve, distal to the thickening caused contraction of the upper portion of the sartorius. However, compression of the same nerve above the thickened area, did not cause contraction of the muscle. This area of nerve was excised and sent to the pathologist for study. In addition, two other specimens, comprising scar, left node or foreign body from just below Poupart's ligament were sent to the pathologist." (Italics mine.)

The findings of the pathologist which appear in exhibit No. 11 are, in part, as follows:

"Specimen C, labelled small nerve and scar or suture, identifies a small nerve with surrounding collagenous connective tissue; there are also large portions of suture material with surrounding foreign body giant cells.

"Diagnosis: Segments of ligament and collagenous connective tissue with small nerve and with suture material and foreign body reaction."

Referring to the tests given by Dr. Frewing on the nerve adherent to Poupart's ligament, Dr. Davis testified on direct examination, as follows:

"Q. Well, would the test evidence some injury or damage of some kind to the nerve? A. To the branch, yes."

Dr. Davis further testified:

"Q. You are speaking now about the type of work that you as a neuro surgeon does knowingly with respect to a nerve? A. Yes, sir. Q. Do you make a practice of sewing the nerve ends into the soft tissues and to the scar? A. No, sir."

Dr. Frewing testified in reference to the result of the pinching test of the nerve:

"Q. Have you any explanation of why you had that result? A. I felt that this was part of the scarring process that was in this area (indicating) and this *particular nerve was bound down* a little more firmly than some others."

On cross-examination, the following question and answer appears:

"Q. Did you — you did not mean that there was a branch nerve there that you would not ordinarily find in another person? A. I was not surprised to find this branch. There is ordinarily a branch [interruption]"

If the jury could infer from the above evidence that a branch of the femoral nerve was sewn into the soft tissue at the time the appellant was suturing the incision, the standard of care required in the Vancouver area in the performance of such an operation would have been violated irrespective of the absence of a statement by a medical witness that it had been violated. The testimony is clear that a branch of the femoral nerve was adherent to the underside of Poupart's ligament. It was encased in scar tissue, and suturing material was present; it was surrounded with foreign body giant cells which is nature's way of protection from the invasion of a foreign body; the branch of the femoral nerve is not normally attached to Poupart's ligament; the injured branch was not a mere small cutaneous or surface sensory nerve; it was one and one-half inches beneath

the surface of the skin and beneath Poupart's ligament; it was where a surgeon could have and should have, with the exercise of reasonable care, observed and discovered it as did Dr. Frewing in his exploratory operation. The evidence is of such clarity that any layman could conclude that this branch of the femoral nerve, where it was found attached to Poupart's ligament, was there by virtue of its having been sewed into the soft tissue when the appellant doctor sutured the incision. The "chain of circumstances" rule as set forth in *Crouch v. Wyckoff*, 6 Wn. (2d) 273, 107 P. (2d) 339, cited by the majority applies. This constituted negligence for which the appellant was liable if any harm resulted to the respondent therefrom.

The testimony is clear that the respondent was in reasonably good health before her operation which was performed by the appellant; that immediately after the operation, upon coming out of the anesthetic, she was in extreme pain at the site of the incision and she has, almost continuously, endured pain ever since; that she was operated on for hernia on June 21, 1952. The record discloses substantial testimony that she thereafter suffered from a condition known as reflex dystrophy or causalgia, and that this condition was a result of the hernia operation.

Dr. Davis testified:

"Q. And I note on her medical chart that on the occasion of this hospitalization the admitting diagnosis was causalgia post traumatic, left leg. Do you find that? A. Yes, sir. Q. That was your diagnosis, pre-operative diagnosis? A. Yes, sir. Q. And the final diagnosis was the same? A. Yes, sir. Q. And what did this diagnosis mean, Doctor? A. Merely that she had a causalgia or causalgia-like syndrome.

"Q. Well, in any event, it was your opinion that her causalgia-like symptoms were a result of a trauma to her left leg? A. Depends on what you mean by 'trauma.' Q. What did you mean by it — that is what I am trying to get at, Doctor — when you wrote it in on the medical chart? A. Apparently this woman had developed an irritative type or irritative symptoms following an operative procedure. Q. Referring to the hernia operation? A. Yes, sir. Further than that I do not know."

Dr. F. Boersma, the respondent's physician who saw her fairly continuously within about six weeks after the hernia operation, diagnosed her condition as reflex dystrophy. This diagnosis by Dr. Boersma *appears on the hospital records of eleven different exhibits*, reflecting eleven different occasions when she was in the hospital under his care. The diagnosis of Dr. Kenneth E. Livingston, staff physician, appears in the hospital record (exhibit No. 41) as causalgia-post traumatic left leg.

Dr. Boersma testified as follows:

"A. Then on the 30th, September the 30th [1952], have a telephone conversation; she was very miserable. She did come to the office that day to take the films that had been taken the day before and deliver them to Dr. Selling. We had taken AP and lateral films of the pelvis and of the lumbosacral spine. I have a notation here of a tremendous emotional ailment, *believe that may have an organic basis following surgical procedure so closely.*

"Q. Is the jury to understand that as of now your diagnosis of reflex sympathetic dystrophy still holds good? A. Yes, it does." (Italics mine.)

Dr. Edward Kloos, who made a neurological examination of the respondent, testified as follows:

"Q. Did you come to any conclusion or form any opinion from your examination and the history which she related to you and the information that you had as to whether or not Mrs. Richison was suffering from a condition known as sympathetic reflex dystrophy? A. That is a loose term, yes, I think she probably was. It depends on one's interpretation of that."

The remaining link in the chain to be considered to determine the question of liability to be placed upon the appellant as a result of the operation is a showing that the respondent's condition of causalgia or reflex dystrophy was proximately caused by the appellant's negligence in injuring the branch of the femoral nerve in the performance of the herniorrhaphy. On this issue the following testimony by the appellant appears in the record:

"Q. Well, then, see if we can shorten it. It is a medical fact, is it not, that a patient may suffer reflex sympathetic

dystrophy when that patient has not suffered trauma to a major peripheral nerve trunk? A. Yes. Q. Which means that a patient who suffers trauma to a branch of a major peripheral nerve may suffer from reflex sympathetic dystrophy? A. May? Q. Yes, do you agree? A. That is right."

Dr. J. Bonica testified:

"Q. If it occurs to a patient, that is if causalgia follows to that patient, why it's some pretty real, isn't it? A. Yes, if it's due to an injury, of course. Q. *Does the pain of causalgia occur often immediately after the injury? A. Yes.* Q. *I want to ask you, Doctor, to give me the characteristic symptoms of causalgia,* and I am looking at Page 950 of your book, if that will speed it up any. A. Well, I would have to remind myself. *It's a pretty classical picture. Severe, almost always severe, burning pain, that is the characteristics, associated with hyperalgesia, hyperesthesia, vasamotor disturbances and subsequent trophic changes of a marked degree.* Q. All right. I want to ask you, in addition to that, if another symptom is erratic alteration of the disposition and emotional state of the individual? A. Yes. Q. And I want to ask you if, in addition to that, if sudomotor disturbances is not another symptom? A. Yes. Q. And I want to ask you with reference to the pain which is symptomatic, if the following, using your language again, is still your present opinion: 'Pain, which is usually continuous, severe, poorly localized, irradiating and burning in quality and easily exacerbated by peripheral and central (emotional) stimulation—.' A. Yes. Q. In early cases of causalgia, is it your present opinion as follows: *'In the early and/or milder cases the pain is limited within the territory of the injured nerve, but in severe and/or prolonged cases the pain, while most intense in the autonomous zone of the affected nerve, has a characteristic, diffuse, irradiating, poorly localized distribution well beyond the confines of the nerve.'* A. *Yes.* Q. *I want to ask you if with causalgia the pain from a partial lesion to a nerve— A. I would like to insert 'major nerve' in there, please. Q. Let me rephrase the question. Dealing with causalgia, if pain from a partial lesion to a nerve is not promptly relieved, may it spread to the entire extremity and to other parts of the body? A. I would still like to qualify by saying 'major nerve,' yes. Q. I thought under your definition of causalgia it had to be that, so I— A. Yes. Q. I am following your answer is 'Yes?' A. Yes.*" (Italics mine.)

Dr. Kloos testified further as follows:

"Q. Now I note in your report, and I am reading from Page 2 of it, you say that on examination it appeared the skin of the entire left leg was extremely hypersensitive to even the very slightest touch. I assume that is a truthful statement? A. To the best of my knowledge, it is. Q. Well, you were examining her. You could tell whether she was sensitive or not, couldn't you. A. Yes. Q. And that was, she was extremely hypersensitive to the very slightest touch, right? A. Yes. Q. And that extended well up into the flank and the left lower quadrant of the abdomen, didn't it? A. Yes. Q. *And that would be the site of the original hernia operation and Dr. Frewing's corrective operation, wouldn't it? A. And above.* Q. Now from all of your investigation, referring again to your report, the second paragraph and the second sentence thereof, you learned that following her hernia surgery she had immediate severe burning lancinating pain in the entire left lower extremity, didn't you? A. Yes." (Italics mine.)

Dr. Davis testified further as a result of his examination of Mrs. Richison:

"A. There was a healed scar over the groin. She was quite tender around this. Actually it was rather difficult to examine her because of her very wide spread tenderness. There was a—let me put it this way: In testing her sensation there was what we would term a hyperesthesia. In other words, she was more sensitive to stimulation such as pin prick or touch over a wide area in her leg, perhaps a little more sore over the inner surface of the thigh. The leg was slightly colder on the left than on the right and it was, it was a little different in color in that it tended to have a slightly mottled, purplish color change which was more apparent perhaps in the foot than the upper leg.

"Q. *After examining the patient did you come to a tentative diagnosis, Doctor? A. Yes. I thought this was a causalgic-like syndrome. I could come to nothing more definite than that. Sometimes with an irritative lesion these people get involvement of their sympathetic nervous system, and she seemed to show some of the evidences of sympathetic irritation. Q. Is that, medically speaking, a reflex sympathetic dystrophy? A. Yes, sir.*

"Q. Doctor, what opinion did you reach on this first occasion concerning the cause of this causalgic-like pain? A. She apparently had an irritative scar. At least her main

tenderness was there. And I thought it was perhaps on the basis of an irritative scar. Q. An irritative nerve phenomena? A. Certainly the nerves were involved, yes. Q. What nerves, Doctor, in your opinion? I mean I know you didn't operate on her leg— A. She had findings which involved the whole leg. In other words, she had both femoral and sciatic involvement, a very diffuse thing. *Her major hyperesthesia and tenderness appeared to be in the saphenous division of the femoral. Q. Is the saphenous nerve a separate or of a separate origin from the cord or is it a lower branch of the femoral? A. It is a branch of the femoral.*

"Q. Now, I am going to ask you again if it was then your opinion on July 20th, 1954, that this woman, Mrs. Richison, has an irritative nerve phenomena associated with involvement of branches of the femoral nerve at the time of her initial surgery? A. Yes, there may have been some involvement of small sensory branches.

"Q. I have some old charts, maybe, instead of new ones. That is what I was trying to enlighten myself on. All right. Now, a while ago you used the term 'causalgic.' Would you explain the meaning of that word? A. The term itself is—I believe it comes from the Greek and it means a burning pain. It was, I think, first used probably by Weir Mitchell in his description of causalgias that occurred during the Civil War, and he described a burning type of pain due to an irritative disturbance in which there was a great deal of sympathetic nerve activity with sometimes increased sweating, sometimes decreased, change in temperature, color, skin, so on. Q. And the irritative process involves what structures of the body? *A. Usually in order to get a causalgia there is some involvement of nerve fibers.*

"Q. . . . Will any trauma to the nerve which interferes with its continuity, although not completely so, be a possible cause of causalgia? A. Yes. Ordinarily causalgias develop in injuries where the nerve continuity is not completely disrupted. It may occur with very minor injuries." (Italics mine.)

A letter to Dr. Boersma from Dr. Davis stated as follows:

"On examination, she shows marked tenderness over the left inguinal region and a hyperesthesia which seems to be primarily in the saphenous nerve distribution. She is very tender over the scar. The leg is somewhat discolored and tends to be a little purplish and there is some edema around the ankle. The leg particularly below the knee is somewhat colder than the right.

"As I mentioned to you over the phone, I think *this woman has an irritative nerve phenomenon associated with involvement of branches of the femoral nerve at the time of her initial surgery.* She is developing many of the findings of a causalgia or at least a reflex sympathetic dystrophy. . . ." (Italics mine.)

Dr. Bonica testified further:

"A. Yes, that is. Q. I mis-spoke myself, I take it. I will ask it again. Is it still your present opinion that in the overwhelming majority of cases of causalgia the nerve lesion is incomplete? A. Yes.

"Q. I said, if a nerve was sewed, sutured— A. Oh, yes. Q. (continuing)—to a ligament so that it adhered to the ligament and scar tissue formed around it, that would be an incomplete lesion, would it not? A. Of the nerve? Q. Yes. A. Yes."

From the above medical testimony, it would appear that the facts are so obvious that a layman could conclude that causalgia is caused by nerve damage; that the pain was in the area of an injured branch of the femoral nerve, near the nerve trunk; that the result of such a nerve injury would probably cause harmful results to the sympathetic nervous system and produce causalgia; that the respondent suffered with causalgia as a result of the operation. The chain of circumstances or facts, as testified to by medical witnesses, would justify the jury as laymen to infer that the condition with which the respondent suffered following the operation was proximately caused by appellant's violation of the standards of medical practice in Vancouver, in damaging a branch of the femoral nerve by negligently sewing it into the soft tissue; that any absence of direct testimony as to such conclusion is not essential in this case; that the rule of the "chain of circumstances" again here applies. *Crouch v. Wyckoff, supra,* cited in the majority opinion. Also, see *Marlowe v. Patrick,* 181 Wash. 647, 44 P. (2d) 776.

The remaining assignments of error made by the appellant to the proceedings in the trial court were not reached by the majority. However, an examination of the record

discloses it does not support the contentions raised by these assignments.

The trial court should be affirmed.

FINLEY and FOSTER, JJ. (dissenting)—We dissent. The evidence was sufficient to take the case to the jury.

---

January 13, 1960. Petition for rehearing denied.