BENJAMIN BATTISTELLA, Respondent, v. SOCIETY OF THE NEW YORK HOSPITAL, Appellant.

First Department, October 20, 1959.

*Donald J. Fager* of counsel (*Robert J. Bell* with him on the brief; *Martin, Clearwater & Bell,* attorneys), for appellant.

*Louis Grossman* of counsel (*Herman Cahn* with him on the brief; *Grossman & Grossman,* attorneys), for respondent.

BREITEL, J. Plaintiff, a former employee of defendant hospital, sued in negligence to recover for personal injuries. These injuries consisted of the continuance and aggravation of untreated pulmonary tuberculosis caused by defendant hospital's failure to discover and disclose his condition to him. The case was tried twice before a jury without definitive determination. On the first occasion there was a mistrial; on the second trial the jury failed to agree. Finally both parties submitted the case to be tried without a jury on the record of the last trial. The trial court found in favor of plaintiff and awarded damages of $4,000. The hospital has appealed.

Raised as issues on the appeal are whether the hospital's negligence was established and also whether there was a duty by the hospital to discover, and then to disclose, plaintiff's condition to him so that he might abstain from improper work and receive proper treatment. Since it is concluded that negligence has not been established, whether the evidence be viewed from the point of sufficiency or its weight, defendant must prevail on this appeal.

Plaintiff, a young man who had served in the Armed Forces, sought employment in June, 1951 as a maintenance worker in the hospital's engineering department. Pursuant to the practice of the hospital, plaintiff was required to take a pre-employment physical examination conducted by physicians on its staff. As a part of such physical examination he submitted to chest X-ray photography. These are of the type described in the medical profession as survey X-rays and the film frames measure 3½ by 4½ inches. The significance of the size is that where there is reason to pursue further the X-ray examination of the chest it is customary to use X-ray plates measuring 16½ by 13½ inches. Two examining physicians determined that the small photographs were negative, meaning that there was no unusual or pathological indication. Plaintiff was also found physically fit in other respects and his employment with the hospital continued for approximately six months. Concededly, plaintiff's work was " hard and dirty ". It involved primarily the oiling of heavy machinery and the replacement of large

filters in air conditioning machinery used in the hospital. The places of work were frequently subject to extremes of temperatures, high humidity, and dust-laden atmosphere.

In the early part of 1952 plaintiff became patently ill. An X-ray photograph, of the larger size, was taken by the hospital, and lesions detected having an appearance characteristic of pulmonary tuberculosis. A further series of X-ray photographs, of the size of 16½ by 13½ inches, were taken of his chest and they disclosed unequivocally the situs of a tuberculosis. Examination now of the earlier and smaller survey photographs revealed the same situs of tuberculosis, and established that the condition had become aggravated during the intervening period. Defendant's physicians noted in their records that the tuberculosis "spot" had been "missed" in the pre-employment examination. Concededly, if the hospital had discovered the condition on the pre-employment physical examination it would not have employed plaintiff and it most certainly would not have assigned him to the kind of work to which he had been assigned, which work undoubtedly aggravated his condition. On the contrary, plaintiff would have been advised to take the necessary rest and treatment to arrest the tubercular condition. Following the diagnosis he received extended treatment and hospitalization from the hospital, at no cost to him, and his tubercular condition has been arrested. But this treatment and cure took a long time and he did not return to regular employment until July, 1954.

One who voluntarily undertakes to act with respect to another's health or safety and who thereby leads the other to refrain from protecting himself may, under certain circumstances, be liable for negligence in performance of the undertaking. (*Elias* v. *Lehigh Val. R. R. Co.*, 226 N. Y. 154, 157; *Union Carbide & Carbon Corp.* v. *Stapleton*, 237 F. 2d 229; Restatement, Torts, § 325; Prosser, Torts [2d ed.], pp. 186–188.) Whether the principle applies in the present context would, of course, depend upon whether there is reasonable basis for the examined person to rely upon the examination.

Concededly, the hospital examines its employees primarily for its own benefit. This is something the person examined knows, and, hence, although there may be some reliance, it is in some lesser degree than in the case of a regular patient. Thus, whether, as a result of such examination, there is a duty to discover, as well as to disclose, any medical condition requiring treatment may be difficult to resolve. A similar question would arise in connection with entrance or other physical examinations given by many nonhospital employers, educational institutions,

governmental organizations and others, where it is primarily the purpose of the examiner that is to be served, rather than that of the person examined. Moreover, even where examinations are conducted in such activities as mass tubercular surveys, for the benefit of the person examined, it is doubtful that the same grade of skilled technician would be required as in the case of the private consultation at patient's request. But these matters need not be decided in the present case because, even assuming there was a duty to discover, as distinguished from a duty to disclose, it is apparent on this record that the hospital's negligence has not been shown.

The hospital offered the testimony of two medical experts. Both of them examined the small survey photographs without being advised of what to look for and before seeing the larger, later series of X-ray photographs. Each expert testified that he could not then discover the tuberculosis spot. No difficulty was encountered in discovering the tubercular lesion in the larger, later series of X-ray photographs, which they were then shown. One of the experts, after having examined the larger photographs was able to discover the lesion in the smaller photograph. The other said that he still could not.

One of the hospital's experts testified that the experience with qualified radiologists discloses an error of approximately 27% on survey readings where the finding is negative. He said there was even an error when the finding was positive, but then it ran only from 2% to 5%. This testimony becomes quite significant when compared with that of plaintiff's expert.

Plaintiff's expert first testified that there was a margin of error with qualified radiologists of around 10%. When confronted with written medical authorities which expressed the percentages as much higher, he said that he would not dispute the higher figures, said that he had never come across a difference as large as 20%, but said that he could imagine it could occur with the small films.

Repeatedly, to justify his own lower percentage, he took refuge in the distinction between the smaller films and the larger films. But, of course, the only question in the case was whether there had been negligence in the reading of the small films.

It is interesting that plaintiff's expert, in reading the X-ray series in this case had all of them submitted to him at one time. Thus, initially, he had the benefit of the series of larger X-ray photographs. These evidently show clearly the pathological shadow spot. As a consequence, he would be led to, and therefore would have had little trouble in finding the spot in the

earlier small film which had been " missed " by the two examining physicians in July, 1951.

Most importantly, while plaintiff's expert testified that the tubercular lesion, referring to the small survey photograph, was " there to be seen ", he never testified that in his opinion a qualified radiologist acting competently must have discovered it.

Of a physician it is required that he exercise reasonable care measured by the skill and knowledge commonly possessed by the members of the medical profession in good standing in the locality where he practices (*Pike* v. *Honsinger,* 155 N. Y. 201, 209; Prosser, Torts [2d ed.], pp. 132, 133). The standard allows for errors of judgment reasonably to be expected in context. (*Pike* v. *Honsinger, supra,* p. 210; *Stone* v. *Goodman,* 241 App. Div. 290, 295.) Hence, the hospital is not liable merely because its physicians " missed " the tubercular " spot " in the survey film. It must also be shown that missing the particular tubercular lesion was a negligent act. On this record and the analysis made of it the conclusion that there was negligence may not be drawn.

Plaintiff, both at Trial Term and in this court, stresses the applicability of *Union Carbide & Carbon Corp.* v. *Stapleton* (237 F. 2d 229, *supra*). That case, which superficially, on its facts, seems closely applicable to this one, actually rests upon an entirely different basis. While in the *Union Carbide* case over a period of years there had been the discovery and knowledge that the employee had an arrested tuberculosis, the employee denied that he had ever been so advised. These findings, the Court of Appeals held, were binding on the court. STEWART, J. (now Mr. Justice STEWART of the United States Supreme Court) expressly said that the case " does not present the question of when, if ever, a principal may be liable for the negligent failure of a carefully selected physician in his employ to exercise the skill and judgment of a reasonably prudent and careful physician " (p. 232). Instead, it was assumed that the physicians had exercised their skills properly, but the issue was whether the defendant in that case should have disclosed what it knew to the employee in order that he might seek and receive the cure and treatment he required, as well as abstain from activity which was injurious. The case, therefore, involved a clear situation of a duty to disclose, as distinguished from a duty to discover, together with a finding, which the court would not review, that there had been a negligent failure to disclose. At the same time there was no act of malpractice by the physicians charged or involved.

Much is made by plaintiff, and it was discussed at Trial Term, that the hospital had some burden of proof or of going forward in establishing the competence and qualifications of the two physicians who examined plaintiff in July, 1951. Indeed, it appears from the record that these two physicians had conducted examinations and interpreted X-ray films in the hospital radiology department, respectively, for about two-and-a-half years and six years. But the controlling factor is that this record is lacking in proof that the survey photographs must initially have been read as positive by competent physicians. Hence, no inference that the physicians lacked competence or were unqualified may properly be drawn. (See *Farmers' Loan & Trust Co.* v. *Siefke,* 144 N. Y. 354, 359.) In short, the very analysis which requires the reversal of the determination in this case disposes of plaintiff's contention that the burden of going forward with the evidence shifted to the hospital.

Accordingly, the judgment in favor of plaintiff should be reversed, on the law and the facts, and the complaint dismissed, with costs to defendant-appellant.

BOTEIN, P. J., RABIN, McNALLY and STEVENS, JJ., concur.

Judgment unanimously reversed, on the law and on the facts, and the complaint dismissed, with costs to the defendant-appellant.

Settle order.