Leslie W. JINES, Appellant,

v.

GENERAL ELECTRIC COMPANY, a Corporation, Appellee.

No. 17540.

United States Court of Appeals
Ninth Circuit.
May 15, 1962.

Charles T. Morbeck, Kennewick, Wash., for appellant.

John Gavin, Gavin, Gavin, Robinson & Kendrick, Robert R. Redman, Yakima, Wash., for appellee.

Before ORR, HAMLEY and MERRILL, Circuit Judges.

ORR, Circuit Judge.

Appellant (hereinafter also referred to as Jines) developed tuberculosis. Immediately preceding the discovery that he was afflicted with tuberculosis appellant had been employed by appellee (hereinafter also referred to as GE). Appellant asked for damages upon the grounds that appellee breached its duty to him: (1) in failing to exercise due care in discovering the tubercular condition, and (2) in a failure to disclose the existence of the condition to Jines and to refrain from assigning him to work which would aggravate the condition after it was or should have been discovered.

Appellant filed his action in a Washington Superior Court. The action was, on petition of appellee, removed to the Federal District Court. The cause was tried to a jury which returned a verdict in favor of appellant. Appellee moved for judgment in its favor notwithstanding the verdict. The motion was granted, one ground for such action being that there was no evidence to show a breach of any duty owing to appellant by appellee. In reviewing this ground, we examine the evidence in the light most favorable to appellant.

Appellant went to work for appellee as a clerk at its Hanford Atomic Plant near Richland, Washington, in the fall of 1955. Prior to his employment, on October 24, 1955, appellant underwent a physical examination and furnished GE with a complete personal medical history as was required of all prospective employees. Part of this entrance physical examination included the taking and interpretation of a chest x-ray. These x-rays are read by independent radiologists under contract to appellee. Appellant's initial x-ray was interpreted negative—lung fields clear—no disease apparent.

As part of its continuing medical and "health counselling" program for its employees, appellee maintained, without charge or payroll deduction, a medical center in the City of Richland and field first aid stations at the Hanford Plant. These were staffed by a corps of doctors and nurses. Periodic physical examinations were provided for appellee's employees and they were invited to consult with appellee's medical staff about their health problems.

On May 23, 1957, appellant reported at appellee's facilities for an interim physical examination. Prior to that date, on April 17 and May 20, he had reported to the medical staff symptoms of headache and vomiting, attributed on the first occasion to recurrent nervous tension and on the second to circumstances unequivocally indicating "hangover." As was its practice, GE reported the results of the May 23rd physical examination to Jines by form letter as follows:

"This is to advise you in regard to your recent medical examination. The General Electric Company provides you with a medical examination primarily to help make your job safe. These examinations are in no way intended to replace reliance upon your private physician or the periodic examinations which you would otherwise have. Although they are limited in their scope and are for a special purpose, they may provide many times a valuable supplement to a personal health protection program by detecting abnormal conditions which were previously unknown.

"In addition to my examination, the examination includes diagnoses by a radiologist, pathologist, and other specialists in private practice when indicated. In your case, no conditions were disclosed or recommendations made for corrective action on your part at this time."

The next notation to appear in Jines' medical record is his report of flu, aching, and sore throat on September 16, 1957. On November 18, 1957, he reported to the medical staff that his sister, who lived nearby, had been hospitalized for TB and that he wondered whether he

should be checked. About a week later he was checked by x-ray and at the same time reported a three-day absence from work due to a head cold and generalized aching. On November 26th, this most recent x-ray was interpreted, "Lung fields show no active disease." The correctness of this reading stands undisputed in the record. Between the last-mentioned physical examination and the following one, Jines' record shows that he reported but once to the medical staff, and this report concerned nausea and vomiting attributed by Jines to some milk he had drunk.

On April 3, 1958, Jines underwent another physical examination and furnished GE with an interim medical report in which he characterized his own health at that time as "good." The x-ray taken at this time was also interpreted as being negative, however, the reasonableness of said reading is now vigorously challenged. At about this same time, Jines reported a condition described as "depression psychosis" to a staff doctor who discussed the problem with him and referred him "to the Public Health Service, Social Service, for counseling." Jines was reported to have "accepted the referral readily." Later in April Jines reported a two-day absence from work due to flu. In May he reported a strain of his back in the right scapular region, due to slipping from a carry-all.

On June 25, 1958, Jines reported that he had been coughing some recently and inquired about when he was due for another x-ray. The record shows that he was advised by a member of the staff to call on a Dr. Seely or a Dr. Crook at GE's Richland medical facility for follow-up treatment. Jines admits that he did not follow this advice. During the remainder of June, July and August Jines variously reported a headache, nausea due to inhalation of an insecticide, stomach upset and a temporary inability to eat or sleep. These latter conditions were discussed with the medical staff and were attributed to Jines' recurrent emotional problems and nervous tension.

Although Jines testified that beginning late in 1957 he had reported troubles in his right shoulder to the GE medical staff, the first such complaint that appears in the medical record is dated September 11, 1958. At this time Jines stated that a chiropractor whom he had been visiting for back pains due to an old injury suggested that his lungs were the source of his latest pain in his shoulder. Jines was referred to a private physician, a Dr. Mills, who a week later took further x-rays and diagnosed the condition as pneumonic tuberculosis. Hospitalization with bed rest was ordered immediately, chemotherapy was begun, and in March, 1959, surgery was undertaken and a portion of Jines' right lung was removed.

The foregoing is a summary of the evidence produced at the trial. Appellant produced expert testimony. One of his expert witnesses, a Dr. Williamson, connected with the Veteran's Administration, testified that examining serially the x-rays taken in September, 1958, and later, and looking *backward* at the disputed x-ray of April 3, 1958, he was able to detect a minute fluffiness or incipient tubercular condition in the portion of the right lung where the disease subsequently developed. There is no testimony by anyone who had not previously viewed the later x-rays that the one of April 3, 1958, exhibited evidence of a developing tubercular condition.

To Dr. Williamson, and to Dr. Crook of the GE staff, whom appellant called as an adverse witness, appellant's attorney propounded a hypothetical question based upon appellant's entire medical record as outlined above plus the additional but unrecorded complaints of pain in the right shoulder, and inquired of the doctors what action, if any, they personally would have taken if confronted by a patient with this record.[1] Both

1. Appellant's attorney also sought to elicit from Dr. Crook, who was the first witness, what the local community standard of practice would have required a

replied to the effect that they would make a referral of the patient for further studies.

In reviewing the trial court's action in granting the motion for judgment notwithstanding the verdict we keep in mind that this is not an action for malpractice. Indeed, such an action could not be successful against GE. The Washington courts have refused to entertain such actions against a defendant who provides medical services gratuitously. They have done so by invoking the theory of charitable immunity, and have imposed upon such a defendant only the duty of exercising reasonable care in the selection and retention of its medical personnel. See, e. g., Richardson v. Carbon Hill Coal Co., 10 Wash. 648, 39 P. 95 (1895), Wells v. Ferry-Baker Lumber Co., 57 Wash. 658, 107 P. 869, 29 L.R.A.,N.S., 426 (1910), Simon v. Hamilton Logging Co., 76 Wash. 370, 136 P. 361 (1913), and Engirbritson v. Tri-State Cedar Co., 91 Wash. 279, 157 P. 677 (1916). But compare Sawdey v. Spokane Falls & N. Ry. Co., 30 Wash. 349, 70 P. 972 (1902). It appeared for a time that such an action could prevail upon the progressive principles laid down in Pierce v. Yakima Valley Memorial Hospital Ass'n, 43 Wash.2d 162, 174, 260 P.2d 765, 772 (1953), which cited the Richardson, Wells and Simon cases, supra, in the course of developing the reasons for "withdrawing the mantle of immunity." Great caution set in, however, and in Lyon v. Tumwater Evangelical Free Church, 47 Wash.2d 202, 287 P.2d 128 (1955), and Pedersen v. Immanuel Luthern Church, 57 Wash.2d 576, 358 P.2d 549 (1961) the wide acclaim which had greeted the Pierce case was proven to be premature as subsequently the court virtually confined Pierce to its facts.

Evidently it was in the face of these later cases that appellant cast this action in the form of a suit for aggravation of the condition due to the assignment of work, and not as one for malpractice.

■ We then have the problem of determining the scope of the duty owed by GE to Jines in light of the theory presented here. The first element was the obligation by GE to disclose to Jines any diseased condition which it discovered, and upon the discovery of any such disease to refrain from assigning him to work which would aggravate such a condition. That this duty was required of GE is clear under Riste v. General Electric Co., 47 Wash.2d 680, 289 P.2d 338 (1955), which follows the great weight of authority in this area.[2] But it is not suggested that the evidence discloses that GE had actual, subjective knowledge of a diseased condition when it assigned Jines to work, or of possessing knowledge it failed to disclose to him. Then the critical question arises as to whether, under the circumstances of this case, and in the exercise of reasonable care, GE *should* have known of the tubercular condition prior to September of 1958. The evidence in this record falls short of establishing the necessary elements of lack of reasonable care.

■ In the usual negligence case the standard of care against which the jury measures the conduct of the defendant is that of the ordinary, reasonable, prudent man. The jury, from its own lay "expertise," at once establishes the standard and judges its breach. But there are exceptions to this rule of which the instant case is one.

■■ The prudent man standard requires some elucidation here, for the prudent layman is not qualified to inter-

---

doctor to do in such a case, but upon objection the question was excluded, and for reasons which do not appear, appellant did not pursue the subject and does not assign as error this ruling of the trial court.

2. See, e. g., Battistella v. Society of New York Hospital, 9 A.D.2d 75, 191 N.Y.S. 2d 626 (1959), Wojcik v. Aluminum Company of America, 18 Misc.2d 740, 183 N.Y.S.2d 351 (1959), Union Carbide Corp. v. Stapleton, 237 F.2d 229 (6th Cir. 1956), Atchison, Topeka & S. F. Ry. Co. v. Perryman, 200 Okl. 266, 192 P.2d 670 (1948), and E. I. DuPont de Nemours & Co. v. Brown, 102 F.2d 786 (3d Cir. 1939). And see Annot., 69 A.L.R.2d 1213, 1215 (1960).

**80**

pret x-rays or take other professional steps necessary to a diagnosis of the condition of tuberculosis. Thus, in this area the jury, unaided by proper expert testimony, will not be permitted to make a finding of negligence.[3] With the benefit of hindsight, the prudent layman may indeed see with great clarity the onset of tuberculosis from a medical record which to the expert examining it before the fact might suggest any one of a host of minor illnesses, or no illness at all. Thus, it is incumbent upon the plaintiff in this class of cases to establish the standard of care, not of the ordinary prudent man, but of the prudent, skilled, trained physician. Brydges v. Cunningham, 69 Wash. 8, 124 P. 131 (1912); Just v. Littlefield, 87 Wash. 299, 151 P. 780 (1915). Because of the wide area which must be allowed for differences of "judgment" in a learned profession, testimony of other physicians that they would have done something different, standing alone, is insufficient to sustain a verdict for the plaintiff. Richison v. Nunn, 57 Wash.2d 1, 2, 16, 340 P.2d 793, 801 (1959). Rather, the local community standard of practice must be shown, and this applies fully to cases of alleged faulty diagnosis. Skodje v. Hardy, 47 Wash.2d 557, 288 P.2d 471 (1955).

Thus, although, as noted above, the theory of this case is not malpractice, we are still concerned with the standard of care required of the prudent physician, not the prudent layman. In order to establish this, the local community standard must be shown, just as in a malpractice case. On this, the record is devoid of evidence. It is true, as we have noted, that appellant offered to show the local community standard and that the trial court refused to permit that showing. But appellant did not preserve that point and has not assigned it as error on this appeal.

Affirmed.

3. The only exception to this rule is the case where negligence is so obvious as to invoke the rule of res ipsa loquitur. See, e. g., Richison v. Nunn, 57 Wash.2d 1, 5, 340 P.2d 793, 795 (1959). This is not such a case.